## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Angela Volness,<br><br>          Plaintiff,<br><br>v.<br><br>I.Q. Data International, Inc., Cameron Webb,<br>Kim Doe,<br><br>          Defendants. | Case No.: 0:22-cv-2037<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.     The United States Congress has found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. Congress wrote the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*., to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

2.     This action arises out of violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., by Defendants and their collection agents

in their illegal efforts to collect a consumer debt from Plaintiff.

## JURISDICTION

3.  Jurisdiction of this Court arises under U.S.C. § 1692k(d), 15 U.S.C. § 1681, and 28 U.S.C. § 1367 for pendent state law claims.

4.  Venue is proper because the acts and transactions occurred here, Plaintiff resides in Minnesota, and all Defendants transact business here.

5.  Defendant IQDI and its collection employees have transacted business within the State of Minnesota by attempting to collect a debt from Plaintiff via the telephone, the mails, and/or through the use of email while Plaintiff was located within and permanently residing within the State of Minnesota.

6.  Defendant IQDI has transacted business within the State of Minnesota by operating a collection agency, making collection calls into Minnesota, and directing debt collection activities to Minnesota.

7.  Defendant Webb has transacted business within the State of Minnesota making collection calls into Minnesota and directing debt collection activities to Minnesota.

8.  Defendant Doe has transacted business within the State of Minnesota making collection calls into Minnesota and directing debt collection activities to Minnesota.

## PARTIES

9.  Plaintiff Angela Volness (hereinafter "Plaintiff") is a natural person who resides in the County of Wright, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3) or a person affected by a violation of that law, and a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

10. Plaintiff has suffered an injury in fact that is fairly traceable to Defendants' collective conduct and that is likely to be redressed by a favorable decision in this matter.

11. Defendant I.Q. Data International, Inc. (hereinafter "Defendant IQDI") is a collection agency operating from a principal office address of 21222 30th Drive SE, Suite 120, Bothell, WA 98021, and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

12. Defendant IQDI's registered agent of process in Minnesota is Corporation Service Company at an address of 2345 Rice Street, Suite 230 Roseville, MN 55113.

13. Defendant IQDI uses interstate commerce and the mails in a business the principal purpose of which is the collection of debts.

14. Defendant IQDI regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

15. Defendant IQDI and its employees and agents directly and indirectly participated in the unlawful efforts to collect an alleged debt from Plaintiff, as further described in this complaint.

16. Defendant Cameron Webb (hereinafter "Defendant Webb") is a collection agent employed by Defendant IQDI and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

17. Defendant Kim Doe (hereinafter "Defendant Doe") is a collection agent employed by Defendant IQDI and is a "debt collector" as that term is defined by 15 U.S.C. §

1692a(6).  Defendant Doe's true name is not known at this time to Plaintiff.

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

18. Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

19. Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

20. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

21. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced her intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114

Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

22. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

23. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

24. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

25. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

26. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to

requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. (Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf).

## FACTUAL ALLEGATIONS

27. Within one year immediately preceding the filing of this complaint, Defendant IQDI attempted to collect from Plaintiff a financial obligation that was primarily for personal, family or household purposes, and is therefore a "debt" as that term is defined by 15 U.S.C. § 1692a(5), by attempting to collect this debt from Plaintiff in the State of Minnesota.

28. Sometime on or before December 2020, Plaintiff incurred an alleged debt to Campbell Properties in Minnesota ("debt") which was an approximate $1,106 charge for alleged unpaid rent and/or damages after Plaintiff moved out of this apartment.

29. Plaintiff disputes this alleged debt, the final bill on this account, and any remaining balance, and is represented by the undersigned counsel both with respect to this debt and to the claims made herein.

30. Sometime thereafter, the debt was consigned, placed or otherwise transferred to Defendant IQDI for collection from Plaintiff.

### *Defendant IQDI's Barrage of Illegal Collection Calls on May 3, 2022*

31.   Sometime on or around May 3, 2022, at approximately 11:47 a.m., Plaintiff received a call from Defendant IQDI on her cell phone from phone number (320) 247-6905, but she missed the call because it had come in from an unknown number.

32.   On May 3, 2022 at approximately 1:42 p.m., Plaintiff's Mom received a phone call on her cell phone from the same phone number (320) 247-6905, Defendant IQDI, but also missed the call and/or did not answer it.

33.   Later, at approximately 1:46 p.m., Plaintiff's sister received a phone call on her cell phone from the Defendant IQDI via the same phone number (320) 247-6905, but she also did not answer.

34.   Defendant IQDI then called again at about 1:49 p.m. to Plaintiff's mom on her cell phone from the same number but still did not answer.

35.   Defendant IQDI then called again at about 1:49 p.m. to Plaintiff's sister on her cell phone from the same number but still did not answer.

### *Collection Call with Defendant Webb on May 3, 2022*

36.   Again, on or about May 3, 2022 at approximately 2:30-3:00 p.m., Plaintiff received another phone call at work from Defendant IQDI from (320) 223-6905.

37.   Plaintiff answered the phone call assuming it was for her job and immediately got bombarded with questions from Defendant IQDI's collection employee to confirm her name and then her date of birth.

38.   When Plaintiff asked what this was for, the individual introduced himself as "Cameron Webb" and he was from Defendant IQDI trying to collect a debt on behalf of Hillcrest Apartments LLP.

39.     Defendant Webb told Plaintiff the total of the alleged debt that was owed, who it
        was owed to, and how it needed to be paid that day.

40.     Plaintiff immediately told Defendant Webb that she could not take these kinds of
        personal phone calls at work, and that he could instead call her cell phone if he
        wanted to talk.

41.     Defendant Webb refused to discontinue the collection call at that point and instead
        kept trying to ask Plaintiff more questions.

42.     Defendant Webb told Plaintiff that Defendant IQDI had tried to contact Plaintiff in
        writing and over the phone and that Plaintiff had not responded.

43.     Defendant Webb also falsely told Plaintiff that if she did not pay this debt today,
        then it was going to get reported to the credit bureaus.

44.     This was a false statement in an attempt to collect a debt because the debt had ready
        been reported to the credit bureaus, Experian, Trans Union, and Experian by
        Defendant IQDI.

45.     Plaintiff told Defendant Webb that she had never received anything from Defendant
        IQDI in the mail and that she was not aware of any personal calls from Defendant
        IQDI.

46.     Plaintiff told Defendant Webb again however that Plaintiff could not deal with this
        matter on her work phone and to call her cell phone if Defendant Webb wanted to
        speak further about it.

47.     Defendant Webb then asked Plaintiff when her next break was for a good time to
        call and she said 3:30 p.m. that day.

48. Defendant Webb then then continued to ask questions regarding Plaintiff's current residential address and a good number at which to reach her.

49. Plaintiff told Defendant Webb her address and her phone number and told him again that the call needed to end because she was on her work phone.

50. Instead of discontinuing the conversation, Defendant Webb rudely barged ahead and started to tell Plaintiff that he needed to get details so he could transfer her to someone else who can put her account on hold from being sent to the credit agencies.

51. Defendant Webb then put Plaintiff on hold and Plaintiff thereafter hung up the phone.

52. After this conversation, Plaintiff spoke with her mother about how Defendant Webb had contacted her at work, only to discover that her mother and sister had received calls from the same number that day.

53. Plaintiff was very upset that Defendant IQDI had called her family members repeatedly and barraged them with collection calls for her debt.

54. The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(a)(3), 1692c(b), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692e(16), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

***Plaintiff's Follow-Up Call with Defendant IQDI on May 3, 2022***

55.    At approximately 3:26 p.m. on or about May 3, 2022, Plaintiff tried to call back to the same phone number she had received the earlier calls from, (320) 247-6905 back on her cell phone and tried to explain some of what happened to Defendant IQDI's debt collection who answered the phone.

56.    The debt collector told Plaintiff that he had to transfer Plaintiff to the agent that had her "case."

57.    After a few minutes of waiting on hold, Plaintiff hung up the phone and went back into work.

### *Defendant IQDI Calls Plaintiff Again on May 3, 2022*

58.    At approximately 3:32 p.m. on or about May 3, 2022, Plaintiff then received another collection call on her cell phone from Defendant IQDI's phone number (320) 247-6905.

59.    This collection call came directly from the Defendant IQDI's same debt collector, Defendant Webb.

60.    Defendant Webb again explained that that he was trying to collect a debt for Hillcrest Apartments LLP.

61.    Plaintiff disputed this debt and tried to explain to Defendant Webb what had happened about this debt, but Defendant Webb did not want to listen to any of it.

62.    Plaintiff also told Defendant Webb that she could not afford to pay a $1,200 debt because she does not have that money just laying around.

63. Defendant IQDI's debt collector Defendant Webb then proceeded to ask Plaintiff how much money she made at her job, and Plaintiff told him how she did not see how that was relevant.

64. Defendant Webb then asked Plaintiff if she owned or rented a home and, again, Plaintiff told him how she did not see how that was relevant.

65. Defendant Webb asked Plaintiff how much her monthly housing payment was and, again, Plaintiff told Defendant Webb how she did not see how that fact was relevant.

66. At this point, Defendant Webb was getting frustrated and he told Plaintiff that if she provided him with her email address, he would send Plaintiff the bill right immediately, and she can pay it in full, otherwise it would go on her credit reports.

67. This was a false and harassing statement in an attempt to collect a debt because Defendant IQDI had already listed this disputed debt on Plaintiff's credit reports.

68. Plaintiff told Defendant IQDI she was not going to do that because she did not have the money to pay this alleged debt.

69. Defendant Webb rudely persisted and falsely told Plaintiff that she needed to answer his questions in order to get to someone else at Defendant IQDI who could get her account on hold so that it would not get credit reported.

70. Defendant Webb told Plaintiff that if Plaintiff did not want to answer the questions, then she had to pay the account in full that day.

71. Plaintiff told Defendant IQDI she was not going to give him her email and questioned how any of his questions were relevant.

72.   Defendant Webb continually interrupted Plaintiff and talked over Plaintiff, falsely and abusively telling her that she had choose one of his options.

73.   Defendant Webb also continuously gaslit[1] Plaintiff during this harassing and abusive debt collection communication and kept telling her to stop raising her voice when Plaintiff was not yelling or being loud, but only trying to finish her sentence before being interrupted again by Defendant Webb.

74.   Defendant Webb again threatened Plaintiff's credit standing with this disputed and alleged debt and again tried to interrogate Plaintiff about her income.

75.   When Plaintiff resisted his abusive questions, Defendant Webb became very frustrated and started to speak over Plaintiff every time she tried to talk.

76.   Plaintiff ultimately ended the call which lasted approximately 20 minutes.

77.   Plaintiff was left shaken, scared, and very upset by the manner in which she was treated by Defendant Webb and by his abusive interrogation of her.

78.   The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(a)(3), 1692c(b), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692e(16), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

---

[1] Gaslight: to psychologically manipulate (a person) usually over an extended period of time so that the victim questions the validity of their own thoughts, perception of reality, or memories and experiences confusion, loss of confidence and self-esteem, and doubts concerning their own emotional or mental stability : to subject (someone) to gaslighting. https://www.merriam-webster.com/dictionary/gaslight#h2 (last accessed July 29, 2022).

### *Third Round of Abusive Collection Communications on May 3, 2022*

79.     On the same day at approximately 3:40 p.m. Plaintiff received another call on her cell phone from (320) 247-6905 from Defendant Webb.

80.     Again, the person introduced himself as Defendant Cameron Webb from Defendant IQDI.

81.     Plaintiff immediately told Defendant Webb that she wanted a debt validation letter sent to her before he asked her any more questions.

82.     Defendant Webb ignored this request and just started to ask her again about her income, housing expenses, and other debt such as student loans.

83.     Plaintiff continued to tell him how she did not see any of this information as being relevant.

84.     Plaintiff repeated to Defendant Webb that she wanted to receive a validation letter so that she could know this is an actual debt and not a scam.

85.     Defendant Webb then told Plaintiff that this was a recorded line for a reason and that it would not be recorded if it was a scam.

86.     Defendant IQDI also asked how he would know things like her full name and date of birth if it was a scam.

87.     Plaintiff then said that it still did not prove anything and that she wanted the debt validation letter.

88.     Defendant IQDI was getting extra annoyed with Plaintiff and started to raise his voice on the phone when asking her questions again.

89. Plaintiff then said that she wanted to speak with someone else three times before Defendant IQDI finally said okay and abruptly put Plaintiff on hold.

90. The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(a)(3), 1692c(b), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692e(16), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

### *Conversation with Defendant IQDI's Debt Collector "Kim"*

91. As a continuation of this same collection call on May 3, 2022, and after holding for a period of time, Plaintiff then spoke with one of Defendant IQDI's debt collectors, a female who identified herself as "Kim [Doe]."

92. Defendant Doe did not provide a last name, but Plaintiff again tried to explain how she disputed this alleged debt with the apartment complex, the whole situation with the apartment and how she got to this place.

93. Defendant Doe was equally uninterested in listening to anything that Plaintiff said.

94. Plaintiff also told Defendant Doe that she wanted this debt validation letter and Defendant Doe likewise ignored the request.

95. In response, Defendant Doe told Plaintiff that it was ridiculous that Plaintiff had only attempted to contact the apartment complex four times over two years regarding this alleged debt.

96.    Defendant Doe then also falsely told Plaintiff that the debt needed to be paid "today" or it was going to go on Plaintiff's credit reports, despite the fact that this debt was already reported by Defendant IQDI to all three major credit reporting agencies.

97.    Plaintiff repeatedly told Defendant Doe that she could not afford this disputed alleged debt.

98.    Defendant IQDI's debt collector Defendant Doe then again started asking Plaintiff the same questions about her monthly expenses that Defendant Webb had asked.

99.    Defendant Doe first asked about her monthly income and Plaintiff again told her that she did not see this information as relevant.

100.   Defendant Doe immediately reacted with anger toward Plaintiff.

101.   Defendant Doe falsely stated that if Plaintiff did not answer these questions immediately, that Plaintiff would have to pay all this alleged debt, or it would immediately go on her credit.

102.   Defendant Doe again asked what Plaintiff's monthly income was, and Plaintiff told Defendant Doe that she did not know, maybe $1,000.

103.   Defendant Doe then asked how much that is an hour and Plaintiff said she did not know.

104.   Defendant Doe was getting more and more angry at Plaintiff during the course of this collection communication.

105.   Defendant Doe then asked how long Plaintiff had been at her current employer company and Plaintiff told her a couple of years.

106.   Defendant Doe said that it did not make sense how Plaintiff had been at that company for that long and only made that much and again asked how much Plaintiff makes hourly.

107.   Plaintiff again told Defendant Doe that she did not know.

108.   Plaintiff tried to explain to an angry Defendant Doe that when she started as a temporary employee, she made less than she does now, but that Plaintiff really did not make a lot.

109.   Defendant Doe seemed to be getting very annoyed with Plaintiff and then moved on to talking about Plaintiff's housing.

110.   Defendant Doe asked if Plaintiff owned or rented somewhere and Plaintiff explained that she rented.

111.   Defendant Doe then asked whether Plaintiff lived alone or with someone else and Plaintiff said that she lived alone.

112.   Throughout this threatening and unnecessary interrogation, Plaintiff felt scared, humiliated, and intimidated by the tone of voice from both Defendant Doe and Defendant Webb and the false sense of urgency regarding a debt that Plaintiff disputed and did not feel she owed.

113.   Defendant Doe then she asked for the amount of Plaintiff's monthly rent and Plaintiff said she did not know exactly, but that it was approximately $900.

114.   Again, Defendant Doe engaged Plaintiff in gaslighting and proceeded to tell her that it did not make sense that Plaintiff made so little money when she had an expensive apartment.

115. Plaintiff then told Defendant Doe that she made possibly a little more than around $1,500 a month.

116. This answer then made Defendant Doe even more angry and she told the Plaintiff that she needs to take this matter seriously and answer her questions.

117. Defendant Doe also kept asking whether or not anyone helps Plaintiff with any of her bills and Plaintiff said no.

118. Defendant Doe then proceeded to tell Plaintiff that it looks like Plaintiff's mom co-signed the lease for her.

119. Plaintiff then acknowledged this statement but told Defendant Doe that her mother had no part in any of this matter and that Plaintiff wanted to make that fact clear.

120. At this point, Defendant Doe was also starting to raise her voice and Plaintiff again asked her to stop injecting her mother into this alleged debt.

121. Defendant Doe then told Plaintiff that Plaintiff can take out a loan to pay the debt off if she cannot afford to pay it right then, and that Defendant Doe would look up loans available for this purpose for Plaintiff.

122. Plaintiff told Defendant Doe that she was not going to take out a loan to pay this disputed alleged debt.

123. Defendant Doe then responded that since Plaintiff did not want to answer her questions, that taking out a loan was Plaintiff's only option.

124. In an effort to resolve this disputed matter and out of desperation and to get the Defendants' collection harassment to stop, Plaintiff then offered to make a payment plan with Defendant Doe for this alleged disputed debt.

125.   Defendant Doe immediately said "No" and that she would not finance Plaintiff's debt and that instead Plaintiff could take out a loan.

126.   Thereafter, Defendant Doe then put Plaintiff on hold in an apparent attempt to arrange a loan for Plaintiff.

127.   Plaintiff thereafter ended the call because she had no interest in taking out a loan to pay this disputed debt or to pay it.

128.   These collection questions from Defendant Webb and Defendant Doe were invasive, abusive, unnecessary, and harassing to Plaintiff.

129.   Defendant Doe and Defendant Webb had both treated Plaintiff like a child and scolded her when she did not comply with their immediate demands for private financial information for which they had absolutely no right to have.

130.   Defendant Doe's suggestion that she would arrange a loan for Plaintiff to pay this account off with a loan was an illegal collection tactic and a threat to share Plaintiff's personal financial information with third parties.

131.   The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(a)(3), 1692c(b), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692e(16), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

***Plaintiff Disputed the Alleged Debt in Writing with Defendant IQDI on May 9, 2022***

132. On May 9, 2022, Plaintiff got the debt collection letter from Defendant IQDI dated April 28, 2022, that had been sent to her Wright County permanent address.

133. Defendant IQDI's collection letter said how much the debt was, plus a little over $110 in interest to the company.

134. That same day, Plaintiff sent out a letter to dispute the debt using the tear off portion of the bottom of a collection letter mailed out from Defendant IQDI on April 28, 2022.

135. Plaintiff checked the box on the form that said, "I want to dispute this debt because...," and then checked "this is not her debt" and "other."

136. Plaintiff also checked the box "I want you to send me the name and address of the original creditor".

137. Plaintiff wrote a short note saying that she wants to receive a debt validation letter along with the name and address of the original creditor.

138. Plaintiff also said that she had not rented through Hillcrest Apartments LLP, because her lease was with Campbell Properties.

139. Plaintiff also noted to only contact her in writing if they needed to contact her to not contact her friends, family or place of work again.

***Illegal Collection Communications Letter***

140. Despite having repeatedly disputed this debt, in writing and otherwise, and telling Defendant IQDI that she refused to pay it, on or about June 4, 2022, at

approximately 10:53 a.m., Plaintiff received another collection phone call from the number (320) 223-6905 that she did not answer.

141.   The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(a)(3), 1692c(b), 1692d, 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

### *Illegal Collection Communications on June 24, 2022*

142.   On June 24, 2022, Plaintiff received another letter in the mail from Defendant IQDI at her current address dated June 21, 2022.

143.   This letter was to inform Plaintiff that Defendant IQDI had received her letter of dispute but since it is was the same as her dispute on file that they are not taking any action.

144.   Despite having disputed this debt in writing directly to Defendant IQDI, Defendant IQDI nevertheless again violated the FDCPA and attempted to collect the debt from Plaintiff.

145.   The above-described collection communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(1), 1692c(c), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(10), 1692e(11), 1692e(16), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

### *Plaintiff's Communications to Defendant IQDI on June 28, 2022*

146. On June 28, 2022, Plaintiff sent another dispute letter to Defendant IQDI regarding the June 21, 2022 collection letter from Defendant IQDI.

147. Plaintiff informed Defendant IQDI that she had only ever sent them one dispute before and had never heard a response.

148. Plaintiff reminded Defendant IQDI why she disputed and that she also asked for the name and address of the original creditor and a validation of debt letter and never received anything.

149. Plaintiff also said that if this could not be provided, she wanted this item taken off her credit from all three bureaus.

### *Defendant IQDI Falsely Credit Reports the Account and Adds Illegal Interest Charges*

150. Defendant IQDI illegally added interest to this debt and falsely reported interest as due and owing on this account on Plaintiff's consumer credit reports, despite the fact that Plaintiff has vigorously disputed the basis and amount of this debt making it an unliquidated amount.

151. Plaintiff disagreed with the Defendant IQDI's assertion about interest on this disputed debt, never agreed to pay this interest or the principal amount and refused to pay this alleged debt.

152. In July 2022, Plaintiff reviewed her consumer credit reports and noted an entry from Defendant IQDI on her report that indicated that this disputed $1,106 apartment rental fee debt with Defendant IQDI had now inexplicably increased to $1,229.

153.   Defendant IQDI repeatedly illegally added interest and/or late fees on this alleged debt, increasing the debt from its original amount by at least $123.

154.   The FDCPA prohibits to addition of any amount over and above the principal amount of the debt unless that additional amount is permitted by the contract underlying the debt or otherwise permitted by law.

155.   Plaintiff never agreed to pay interest in any amount on this alleged debt because she did not agree that she even owed the alleged debt for the apartment rental and disputed it.  See *Tate v. Ballard,* 243 Minn. 353, 360, 68 N.W.2d 261, 266 (1954) ("Liability for interest is purely contractual, and a person is not chargeable therewith unless he has agreed to its imposition. County of Redwood v. Winona & St. Peter Land Co., 40 Minn. 512, 41 N.W. 465, 42 N.W. 473.")

156.   There was no agreement between Plaintiff and Defendant IQDI underlying this debt which permitted these collection fees by Defendant IQDI and these fees are not otherwise permitted by law.

157.   Defendant IQDI's demands from Plaintiff for payment for amounts not due and owing on this obligation was fraud, because it intended that Plaintiff would rely on its representations as to the amount of additional interest on the obligation, and Plaintiff in fact relied on those material misrepresentations to Plaintiff's detriment.

158.   It was a false and deceptive debt collection practice for Defendant IQDI to misrepresent the amount due and owing by Plaintiff for this debt.

159. Defendant IQDI's addition of at least $123 in late charges to Plaintiff's alleged debt to Defendant IQDI was also a violation of numerous and multiple provisions of the FDCPA with respect to Defendant IQDI.

160. The above-described communications and conduct from Defendant IQDI toward Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(5), 1692e(10), 1692e(11), 1692f, and 1692f(1), amongst others, as well as violations of Minnesota law.

### *Plaintiff has Suffered Concrete Harm*

161. The above-described collection conduct by Defendant IQDI in its efforts to collect this alleged debt from Plaintiff were oppressive, deceptive, misleading, unfair and illegal communications in an attempt to collect this alleged debt, all done in violation of numerous and multiple provisions of the FDCPA.

162. These collection actions taken by Defendant IQDI, and the collection employees employed by it, were made in violation of multiple provisions of the FDCPA, including but not limited to all of the provisions of those laws cited herein.

163. These violations by Defendant IQDI were knowing, willful, negligent and/or intentional, and it did not maintain procedures reasonably adapted to avoid any such violations.

164. Defendant IQDI's collection efforts with respect to this alleged debt from Plaintiff caused Plaintiff to suffer concrete and particularized harm because the FDCPA provides Plaintiff with the legally protected right to be treated fairly and truthfully

with respect to any action for the collection of any consumer debt.

165.    Defendant IQDI's deceptive, misleading and unfair representations with respect to its collection effort were material misrepresentations that affected and frustrated Plaintiff's ability to intelligently respond to Defendant IQDI's collection efforts because Plaintiff could not adequately respond to the Defendant IQDI's demand for payment of this debt.

166.    By demanding this $123.00 both in writing and by telephone, Defendant IQDI misrepresented the amount of the debt and the amount owed by Plaintiff in violation of the FDCPA.

167.    As a licensed debt collector in Minnesota, Defendant IQDI knew or should have known that it had no right to add impermissible collection fees under the FDCPA or fees that were not provided under the contract or otherwise permitted by law. See Kojetin v. C U Recovery, Inc., 212 F.3d 1318 (8th Cir. 2000).

168.    On June 29, 2022, the Consumer Financial Protection Board again weighed in on the illegality of add-on collection fees like those sought by Defendant IQDI from Plaintiff:

> Section 808(1) of the FDCPA prohibits debt collectors, in relevant part, from "collect[ing]... *any* amount (*including* any interest, fee, charge, or expense incidental to the principal obligation)." As the Supreme Court has explained, the "word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" In addition, under its ordinary meaning, the term "including" typically indicates a partial list. The CFPB interprets the words "any" and "including" as used in section 808(1) consistent with their ordinary meanings. Accordingly, the CFPB clarifies that FDCPA section 808(1) and Regulation F, 12 CFR 1006.22(b), apply to any amount collected by a debt collector in connection with the collection of a

debt, including, *but not limited to*, any interest, fee, charge, or expense that is incidental to the principal obligation.

…

The CFPB therefore interprets FDCPA section 808(1) to prohibit a debt collector from collecting any amount unless such amount either is expressly authorized by the agreement creating the debt (and is not prohibited by law) or is expressly permitted by law. That is, the CFPB interprets FDCPA section 808(1) to permit collection of an amount only if: (1) the agreement creating the debt expressly permits the charge and some law does not prohibit it; or (2) some law expressly permits the charge, even if the agreement creating the debt is silent.

https://files.consumerfinance.gov/f/documents/cfpb_convenience-fees_advisory-opinion_2022-06.pdf (footnotes omitted, italics in original) last accessed July 26, 2022.

169.    The $123 incidental fees which Defendant IQDI demanded from Plaintiff were not permitted by law and therefore were illegal add-on fees prohibited under the FDCPA.

170.    The above-described communications and conduct from Defendant IQDI to Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692e, 1692e(2), 1692e(5), 1692e(9), 1692e(10), 1692f, and 1692f(1), amongst others.

### *Defendant IQDI's Violations of the Regulation F "Debt Parking" Prohibitions*

171.    Under its rulemaking authority, the Consumer Financial Protection Bureau issued Regulation F, effective November 30, 2021, which further constrains Defendant IQDI's lawful debt collection conduct and further expands Plaintiff's rights under the FDCPA ("Reg. F").  12 C.F.R. § 1006, *et seq.*

(a) Authority. This part, known as Regulation F, is issued by the Bureau of Consumer Financial Protection pursuant to sections 814(d) and 817 of the Fair Debt Collection Practices Act (FDCPA or Act), 15 U.S.C. 1692*l*(d), 1692*o*; title X of the Dodd–Frank Wall Street Reform and Consumer Protection Act (Dodd–Frank Act), 12 U.S.C. 5481 et seq.; and paragraph (b)(1) of section 104 of the Electronic Signatures in Global and National Commerce Act (E–SIGN Act), 15 U.S.C. 7004.

(b) Purpose. **This part carries out the purposes of the FDCPA, which include eliminating abusive debt collection practices by debt collectors, ensuring that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and promoting consistent State action to protect consumers against debt collection abuses. This part also prescribes requirements to ensure that certain features of debt collection are disclosed fully, accurately, and effectively to consumers in a manner that permits consumers to understand the costs, benefits, and risks associated with debt collection, in light of the facts and circumstances.** Finally, this part imposes record retention requirements to enable the Bureau to administer and carry out the purposes of the FDCPA, the Dodd–Frank Act, and this part, as well as to prevent evasions thereof. The record retention requirements also will facilitate supervision of debt collectors and the assessment and detection of risks to consumers.

12 C.F.R. § 1006.1 (emphasis added).

172.    A violation of Reg. F with respect to a consumer is a violation of the FDCPA.

173.    Section 12 C.F.R. 1006.30(a)(1) of Reg. F prohibits a debt collector from furnishing information to a consumer reporting agency about a debt before taking specific actions to contact the consumer about that debt.

174.    A debt collector can satisfy this requirement by: (i) speaking to the consumer about the debt in person or by telephone; or (ii) placing a letter in the mail or sending an electronic message to the consumer about the debt and waiting a reasonable period of time to receive a notice of undeliverability, provided certain other conditions are

satisfied.  A validation notice is one type of letter or electronic communication debt collectors can use to satisfy § 1006.30(a)(1)(ii).

175.   Defendant IQDI violated Reg. F when it credit reported this disputed account on Plaintiff's all three of her consumer credit reports before ever communicating with Plaintiff. 12 C.F.R. 1006.30(a)(1).

176.   Defendant IQDI did not speak with Plaintiff, send Plaintiff a letter, or send her an electronic message before furnishing this information about this disputed account to Experian, Trans Union and Equifax.

177.   The failure to communicate first with a consumer before furnisher adverse credit information is an unfair debt collection practice in violation of the FDCPA. 12 C.F.R. 1006.30(a)(1); 15 U.S.C. § 1692e(8).

178.   The above-described communications and conduct from Defendant IQDI to Plaintiff represent numerous and multiple violations of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(5), 1692e(7), 1692e(8), 1692e(9), 1692e(10), 1692f, and 1692f(1), amongst others.

### *FCRA Violations by Defendant IQDI on Experian Credit Report*

179.   Sometime in or around June 2022, Plaintiff  discovered that Defendant IQDI had added a collection tradeline on her Experian credit report for this alleged debt on or about April 27, 2022.

180.   In or around May 2022, Plaintiff disputed this account directly with Experian, after Defendant IQDI had first furnished it to this consumer reporting agency, as a prerequisite to preserving Plaintiff's rights under the FCRA.  15 U.S.C. § 1681s-

2(b).

181. Despite such written dispute under the FCRA from Plaintiff, Defendant IQDI has not removed the negative tradeline related to this account from Plaintiff's credit report with Experian and instead confirmed it as accurate and continued to illegally add interest to the disputed and unliquidated balance.

182. In or around May 2022, Plaintiff disputed the false and fraudulent account information with Experian credit reporting agency pursuant to 15 U.S.C. § 1681i, by doing a consumer dispute of the item directly with Experian.

183. Thereafter, upon good faith information and belief, Experian forwarded Plaintiff's dispute information to Defendant IQDI for investigation as required by 15 U.S.C. § 1681(a)(2).

184. Upon good faith information and belief, Experian sent an automated consumer dispute verification ("ACDV") to Defendant IQDI regarding the disputed account on this alleged debt.

185. In or around June 2022, Plaintiff received information back from Experian indicating that it had received Plaintiff's written dispute of this fraudulent account but confirmed it as accurate with Defendant IQDI.

186. According to Experian, Defendant IQDI verified that the disputed account belonged to Plaintiff and was accurately reporting on her credit report, in violation of 15 U.S.C. § 1681s-2(b).

187. Defendant IQDI's credit reporting on Experian's consumer report on Plaintiff adversely and/or negatively affected Plaintiff's credit profile when Defendant IQDI was aware that Plaintiff's dispute was legitimate.

188. Defendant IQDI violated 15 U.S.C. §1681s-2(b) when it received the notification of dispute from Experian concerning the Plaintiff's disputed account and thereafter failed to conduct a reasonable investigation and failed to delete the fraudulent account.

189. Plaintiff obtained and reviewed her consumer credit report from Experian again on July 13, 2022.

190. Specifically, Plaintiff's Experian credit report dated July 13, 2022, still contained the Defendant IQDI's fraudulent account and still listed this collection account tradeline against Plaintiff.

191. The account tradeline on Plaintiff's Experian credit report also increased the claimed amount due and owing to $1,229 and indicated that Defendant IQDI had updated this information as of July 9, 2022, despite the fact that she had also disputed it directly with Defendant IQDI in addition to the dispute to Experian.

192. As a result of Defendant IQDI's inaccurate and malicious credit reporting, Plaintiff has suffered reduced credit, emotional distress, embarrassment, frustration, distraction from work, loss of sleep, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

193. Defendant IQDI's false and negative credit reporting on her Experian report caused Plaintiff's credit score to go down during this time frame.

194. Plaintiff takes great care in working and guarding her credit report/score and is now embarrassed and humiliated that her score is not as good as it should be without the Defendant IQDI's adverse account on Experian's credit report.

195. Defendant IQDI's conduct has caused Plaintiff to delay refinancing opportunities to obtain the best possible rates and/or obtaining other credit until the Defendant IQDI's adverse and harmful reporting is removed from her credit profile with Experian.

196. Defendant IQDI failed to conduct a reasonable reinvestigation, or follow the procedures required by FCRA, 15 U.S.C. § 1681s-2(b), in regard to Plaintiff's dispute.

197. Defendant IQDI negligently failed to comply with the requirements of the FCRA.

198. As a result of Defendant IQDI's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including damage to credit worthiness, lost opportunity to receive credit, damage to reputation, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury, as well as attorney fees under 15 U.S.C. § 1681o(a).

199. Defendant IQDI willfully failed to comply with the requirements of the FCRA.

200. As a result of Defendant IQDI's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including damage to credit worthiness, lost opportunity to receive credit, damage to reputation, emotional distress and interference with Plaintiff's normal and usual

activities for which Plaintiff seeks damages in an amount to be determined by the jury.  Plaintiff also seeks punitive damages in an amount to be determined by the jury, as well as attorney fees under 15 U.S.C. § 1681n(a).

201. Plaintiff is entitled to attorney's fees and costs from Defendant IQDI pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

### *FCRA Violations by Defendant IQDI on Trans Union Credit Report*

202. Sometime in or around June 2022, Plaintiff  discovered that Defendant IQDI had added a collection tradeline on her Trans Union credit report for this alleged debt on or about April 27, 2022.

203. In or around May 2022, Plaintiff disputed this account directly with Trans Union, after Defendant IQDI had first furnished it to this consumer reporting agency, as a prerequisite to preserving Plaintiff's rights under the FCRA.  15 U.S.C. § 1681s-2(b).

204. Despite such written dispute under the FCRA from Plaintiff, Defendant IQDI has not removed the negative tradeline related to this account from Plaintiff's credit report with Trans Union and instead confirmed it as accurate and continued to illegally add interest to the disputed and unliquidated balance.

205. In or around May 2022, Plaintiff disputed the false and fraudulent account information with Trans Union credit reporting agency pursuant to 15 U.S.C. § 1681i, by doing a consumer dispute of the item directly with Trans Union.

206. Thereafter, upon good faith information and belief, Trans Union forwarded Plaintiff's dispute information to Defendant IQDI for investigation as required by 15 U.S.C. § 1681(a)(2).

207. Upon good faith information and belief, Trans Union sent an automated consumer dispute verification ("ACDV") to Defendant IQDI regarding the disputed account on this alleged debt.

208. In or around June 2022, Plaintiff received information back from Trans Union indicating that it had received Plaintiff's written dispute of this fraudulent account but confirmed it as accurate with Defendant IQDI.

209. According to Trans Union, Defendant IQDI verified that the disputed account belonged to Plaintiff and was accurately reporting on her credit report, in violation of 15 U.S.C. § 1681s-2(b).

210. Defendant IQDI's credit reporting on Trans Union's consumer report on Plaintiff adversely and/or negatively affected Plaintiff's credit profile when Defendant IQDI was aware that Plaintiff's dispute was legitimate.

211. Defendant IQDI violated 15 U.S.C. §1681s-2(b) when it received the notification of dispute from Trans Union concerning the Plaintiff's disputed account and thereafter failed to conduct a reasonable investigation and failed to delete the fraudulent account.

212. Plaintiff obtained and reviewed her consumer credit report from Trans Union again on July 13, 2022.

213. Specifically, Plaintiff's Trans Union credit report dated July 13, 2022, still

contained the Defendant IQDI's fraudulent account and still listed this collection account tradeline against Plaintiff.

214. The account tradeline on Plaintiff's Trans Union credit report also increased the claimed amount due and owing to $1,229 and indicated that Defendant IQDI had updated this information as of July 9, 2022, despite the fact that she had also disputed it directly with Defendant IQDI in addition to the dispute to Trans Union.

215. As a result of Defendant IQDI's inaccurate and malicious credit reporting, Plaintiff has suffered reduced credit, emotional distress, embarrassment, frustration, distraction from work, loss of sleep, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

216. Defendant IQDI's false and negative credit reporting on her Trans Union report caused Plaintiff's credit score to go down during this time frame.

217. Plaintiff takes great care in working and guarding her credit report/score and is now embarrassed and humiliated that her score is not as good as it should be without the Defendant IQDI's adverse account on Trans Union's credit report.

218. Defendant IQDI's conduct has caused Plaintiff to delay refinancing opportunities to obtain the best possible rates and/or obtaining other credit until the Defendant IQDI's adverse and harmful reporting is removed from her credit profile with Trans Union.

219. Defendant IQDI failed to conduct a reasonable reinvestigation, or follow the procedures required by FCRA, 15 U.S.C. § 1681s-2(b), in regard to Plaintiff's dispute.

220. Defendant IQDI negligently failed to comply with the requirements of the FCRA.

221. As a result of Defendant IQDI's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including damage to credit worthiness, lost opportunity to receive credit, damage to reputation, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury, as well as attorney fees under 15 U.S.C. § 1681o(a).

222. Defendant IQDI willfully failed to comply with the requirements of the FCRA.

223. As a result of Defendant IQDI's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including damage to credit worthiness, lost opportunity to receive credit, damage to reputation, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.  Plaintiff also seeks punitive damages in an amount to be determined by the jury, as well as attorney fees under 15 U.S.C. § 1681n(a).

224. Plaintiff is entitled to attorney's fees and costs from Defendant IQDI pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

### *Summary*

225. The above-described collection conduct by Defendant IQDI in its efforts to collect this alleged debt from Plaintiff were oppressive, deceptive, misleading, unfair and illegal communications in an attempt to collect this alleged debt, all done in violation of numerous and multiple provisions of the FDCPA.

226.  These collection actions taken by Defendant IQDI, and the collection employees employed by Defendant IQDI, were made in violation of multiple provisions of the FDCPA, including but not limited to all of the provisions of those laws cited herein.

227.  These violations by Defendant IQDI were knowing, willful, negligent and/or intentional, and Defendant IQDI did not maintain procedures reasonably adapted to avoid any such violations.

228.  Defendant IQDI's collection efforts with respect to this alleged debt from Plaintiff caused Plaintiff to suffer concrete and particularized harm because the FDCPA provides Plaintiff with the legally protected right to be treated fairly and truthfully with respect to any action for the collection of any consumer debt.

229.  Defendant IQDI's deceptive, misleading and unfair representations with respect to its collection effort were material misrepresentations that affected and frustrated Plaintiff's ability to intelligently respond to Defendant IQDI's collection efforts because Plaintiff could not adequately respond to the Defendant IQDI's demand for payment of this debt.

### *Respondeat Superior Liability*

230.  The acts and omissions herein of the individuals employed to collect debts by Defendant IQDI, and the other debt collectors employed as agents of Defendant IQDI who communicated with Plaintiff as further described herein, were committed within the time and space limits of their agency relationship with their principal, Defendant IQDI.

231.  The acts and omissions by these individuals and these other debt collectors were

incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant IQDI in collecting consumer debts.

232. By committing these acts and omissions against Plaintiff, these individuals and these other debt collectors were motivated to benefit their principal, Defendant IQDI.

233. Defendant IQDI is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of state and federal law by its collection employees, including but not limited to violations of the state and federal law in its attempts to collect this debt from Plaintiff.

## TRIAL BY JURY

234. Plaintiff is entitled to and hereby respectfully demands a trial by jury on all issues so triable.

## CAUSES OF ACTION

## COUNT I.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. § 1692 *et seq.*

235. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

236. The foregoing acts and omissions of Defendant IQDI and its agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 *et*

*seq.*, with respect to Plaintiff.

237.   As a result of Defendant IQDI's violations of the FDCPA, Plaintiff is entitled to

actual damages and statutory damages in an amount up to $1,000.00 pursuant to 15

U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15

U.S.C. § 1692k(a)(3), from Defendant IQDI herein.

## COUNT II.

## FRAUD

238.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as

though fully stated herein.

239.   The Minnesota Court of Appeals has held:

> A prima facie case of fraudulent misrepresentation requires the
> plaintiff to establish that
>
> > (1) there was a false representation by a party of a past or
> > existing material fact susceptible of knowledge; (2) made with
> > knowledge of the falsity of the representation or made as of the
> > party's own knowledge without knowing whether it was true
> > or false; (3) with the intention to induce another to act in
> > reliance thereon; (4) that the representation caused the other
> > party to act in reliance thereon; and (5) that the other party
> > suffered pecuniary damage as a result of the reliance.
>
> *Hoyt Props., Inc.,* 736 N.W.2d at 318 (quotation omitted). "A
> misrepresentation may be made either (1) by an affirmative statement
> that is itself false or (2) by concealing or not disclosing certain facts
> that render the facts that are disclosed misleading." *M.H. v. Caritas
> Family Servs.,* 488 N.W.2d 282, 289 (Minn.1992).
>
> Beckman v. Wells Fargo Bank, N.A., No. A15-1819, 2016 WL 5640664, at *5–6

(Minn. Ct. App. Oct. 3, 2016).

240. During the collection communications transmitted by Defendant IQDI, Webb and Doe to Plaintiff in the past year, Defendant IQDI, Webb and Doe repeatedly and falsely represented to that Plaintiff was obligated to pay interest and other charges on these obligations in excess of the amounts permitted by Minnesota law, when, in material fact, Plaintiff was not so obligated.

241. Defendant IQDI, Webb and Doe knew that the alleged debt it was attempting to collect from Plaintiff had been padded with illegal and impermissible collection fees, and that therefore Plaintiff had no legal obligation to pay it, but it withheld that fact from Plaintiff and instead told Plaintiff that she must pay it.

242. As a licensed Minnesota collection agency, Defendant IQDI knew or should have known that it had no right to add impermissible collection fees under the FDCPA or fees that were not provided under the contract or otherwise permitted by law. See Kojetin v. C U Recovery, Inc., 212 F.3d 1318 (8th Cir. 2000).

243. Plaintiff has suffered actual pecuniary damages as a result of this Defendant IQDI, Webb and Doe's deliberate fraudulent misrepresentations of these material facts.

244. Defendant IQDI, Webb and Doe's misrepresentations that Plaintiff owed this increasing amount, when Plaintiff in fact did not, were material misrepresentations of fact because they influenced Plaintiff's judgment and decisions regarding how to deal with the alleged debt.

245. Defendant IQDI, Webb and Doe knew that its misrepresentations to Plaintiff were false at the time Defendant IQDI, Webb and Doe made them.

246. Defendant IQDI, Webb and Doe's misrepresentations were made intending that Plaintiff would rely on them.

247. Plaintiff reasonably relied upon and acted upon Defendant IQDI, Webb and Doe's misrepresentations and suffered damages in wasted time seeking legal advice and the costs of litigation in this matter to vindicate Plaintiff's rights under the FDCPA, as well as other damages, including lost work time, upset, frustration, embarrassment, and stress.

## COUNT III.

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

## U.S.C. § 1681 *et seq.*

## (DEFENDANT IQDI)

248. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

249. Defendant IQDI violated 15 U.S.C. §1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information.

250. As a result of Defendant IQDI's violations of the FCRA, Plaintiff has suffered actual damages not limited to out-of-pocket expenses, detriment to her credit rating, emotional distress, embarrassment, mental anguish, anxiety, and humiliation in an amount to be determined at trial.

251. Defendant IQDI's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

252.  Alternatively, Defendant IQDI's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

253.  Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant IQDI in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against these Defendants as follows:

- for an award actual damages and statutory damages of $1,000.00 pursuant to 15 U.S.C. §1692k(a)(2)(A) against Defendants IQDI, Webb and Doe and for Plaintiff;

- for an award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) against Defendants IQDI, Webb and Doe and for Plaintiff;

- for actual damages for fraud that were directly caused by relying on the fraudulent misrepresentations made by Defendant IQDI, Webb and Doe to Plaintiff regarding this alleged debt;

- for an award of actual, statutory and punitive damages, and costs and attorneys' fees against Defendant IQDI for violations of the FCRA and for Plaintiff, pursuant to 15 U.S.C. §§ 1681n and 1681o, in an amount to be determined at trial;

- for a judgment and decree and decree that Defendants have engaged in the conduct alleged above, entering Judgment in favor of Plaintiff;

- for all actual compensatory damages suffered;

- for all other recoveries and fees otherwise permitted by these claims and by law;

- for attorney's fees and costs of suit as provided by state and federal law;

- for both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

- and for such other and further relief as may be just and proper.

Respectfully submitted,

Dated: August 17, 2022            **THE BARRY LAW OFFICE, LTD**

By:  s/ Peter F. Barry
Peter F. Barry, Esq.
Attorney I.D.#0266577
333 Washington Ave No, Suite 300-9038
Minneapolis, Minnesota 55401-1353
Telephone:  (612) 379-8800
pbarry@lawpoint.com

***Attorney for Plaintiff***

## <u>VERIFICATION OF COMPLAINT AND CERTIFICATION</u>

The undersigned verifies, certifies, and declares as follows:

1. I am a Plaintiff in this civil proceeding.

2. I have read the above-entitled Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information, best recollection and belief formed after reasonable inquiry.

3. I believe that this Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.

4. I believe that this Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.

5. I have filed this Complaint in good faith and solely for the purposes set forth in it.

6. Each exhibit I have provided to my attorneys that has been attached to this Complaint, if any, is a true and correct copy of the original.

7. Except for clearly indicated redactions made by my attorney where appropriate, I have not altered, changed, modified, or fabricated any attached exhibits, except that some of those exhibits may contain some of my own handwritten notations.

***I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.***

Date ___Aug 18, 2022___ Signature ___*Angela Volness*___
Angela Volness (Aug 18, 2022 14:06 CDT)

Printed Name ___Angela Volness___

**NOTICE TO PRESERVE ALL DOCUMENTS, RECORDINGS, AND TANGIBLE
THINGS, AND ALL ELECTRONICALLY STORED INFORMATION ("Notice")**

To the Defendant(s) Above:

**As you know, this law firm has been retained to represent the Plaintiff in the above
captioned matter ("Lawsuit").** As used in this notice, the terms "you" and "your" refer
to the Defendant(s) above-named and their predecessors, successors, parents, subsidiaries,
divisions and affiliates and its respective officers, directors, agents, attorneys, accounts,
employees, partners, contractors and other persons occupying similar positions or
performing any functions on behalf of Defendant.

**My client respectfully demands that you preserve all recordings, documents, tangible
things and electronically stored information that are in anyway relevant to the
Lawsuit.** A civil suit has been commenced against you by my client in the District Court
herein, related to the matters described herein.

**You have a legal duty to preserve evidence in this matter.** This duty to preserve
evidence exists not only after the formal commencement of litigation, but whenever a party
knows or should know that litigation is reasonably foreseeable. The Minnesota Supreme
Court has specifically addressed this issue:

> We have said that the spoliation of evidence is the "failure to preserve
> property for another's use as evidence in pending or future litigation."
> *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456
> N.W.2d 434, 436 (Minn.1990) (quoting *County of Solano v. Delancy,* 264
> Cal.Rptr. 721, 724 n. 4 (Cal.Ct.App.1989)). Further, we have recognized
> that, regardless of whether a party acted in good or bad faith, "the affirmative
> destruction of evidence has not been condoned." *Patton,* 538 N.W.2d at 119.
> The duty to preserve evidence[2] exists not only after the formal
> commencement of litigation, but whenever a party knows or should know
> that litigation is reasonably foreseeable. *See id.* at 118–19. Breach of the duty
> to preserve evidence once such a duty arises may be sanctioned, under a
> court's inherent authority, as spoliation. *See id.* at 118. Here, we specifically
> reaffirm our rule that custodial parties have a duty to preserve relevant
> evidence for use in litigation. *Id.* at 116. We also reaffirm our previously
> stated rule that, even when a breach of the duty to preserve evidence is not
> done in bad faith, the district court must attempt to remedy any prejudice that
> occurs as a result of the destruction of the evidence. *Id.*

<u>Miller v. Lankow</u>, 801 N.W.2d 120, 127–28 (Minn. 2011)

**Once a duty to preserve evidence has arisen, the breach of that duty may subject a party to sanctions under a court's inherent authority as spoliation.** "Courts have long afforded redress for the destruction of evidence * * *." Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc., 456 N.W.2d 434, 436 (Minn.1990).

**Much of the information that is subject to disclosure or responsive to discovery in this case may be stored on your current and former computer systems and other media and devices, including personal digital assistants, voice messaging systems, online repositories, telephone recording systems, hard drives and cell phones.** The term Electronically Stored Information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, digitally, magnetically, optically or otherwise stored as:

- Audio and/or video records of any telephone calls and conversations made related to the events described in the Lawsuit
- digital communications (for example email, voicemail, imaging, scanning, and/or instant messaging);
- email service stores and server information (for example SQL Server, Oracle, Dropbox, Box, lotus, domino.nsf, Microsoft exchange.edb, Google Corporate Gmail, etc.);
- word processing documents (for example Microsoft Word or WordPerfect files and all drafts thereof);
- spreadsheets and tables;
- accounting application data;
- imaging and facsimile files;
- recordings of any conversations with my client;
- phone records of any calls to my client;
- databases (for example Access, Oracle, SQL Server data);
- Contact and relationship data management (for example Outlook, Ask or Interaction);
- Calendar and diary application data;
- online access data (for example temporary internet files, history files and cookies);
- presentations (for example PowerPoint and Corel presentations);
- network access and server activity logs relating to information exchanged between you and third parties, and by you with third parties;
- project management application data;
- backup and archival files;
- letters, documents, or correspondence of whatever kind related to existing loss prevention policies, and changes, updates, alterations made to loss prevention policies for the past three (3) years

**My client hereby demands that you preserve both accessible and inaccessible ESI**. This demand is reasonable and necessary.  Pursuant to the Rules of Civil Procedure, in the event of an eventual civil suit you must identify all sources of ESI you decline to produce and demonstrate why such sources are not reasonably accessible.  For good cause shown in that event, the Court may order production of ESI even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the Court's authority.

**Preservation requires your immediate intervention.**  You must act immediately to preserve potentially relevant ESI, including, without limitation, information and the earlier of a created or last modified date for ESI concerning any activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand.  Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence.  You must immediately intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence contained therein and constitute spoliation of evidence.

**You are also directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with that litigation hold.**  You are further directed to immediately identify and modify or suspend features of your information systems and devices, which, in routine operation, operate to cause the loss of potentially relevant ESI.  Examples of such features and operations that could result in spoliation include:

- purging the contents of email repositories by age, capacity or any other criteria
- using data or media wiping, disposal, erasure of encryption utilities or devices
- overriding erasing, destroying or discarding backup media
- reassigning, re-imaging or deposing of systems, servers, devices or media
- running antivirus or other programs affecting wholesale metadata alteration
- releasing or purging online storage repositories
- using metadata stripper utilities
- disabling server, packet or local instant messaging login
- executing drive or file defragmentation or compression programs
- shredding or other destruction of documents, routine or otherwise

**You should anticipate that your officers, employees, or others may seek to hide, destroy or alter ESI.**  This is not a concern that is unique to you or your organization.

Rather it is simply conduct that occurs with such regularity that any custodian of ESI and their counsel must anticipate and guard against its occurrence.  You are directed to preserve complete backup tape sets (including differentials and incrementals) containing recordings, emails and ESI for any person involved in the activity, updates, changes, alterations, or modifications to the information maintained by you related to the events described in the above-referenced lawsuit, through the date of this demand, whether inside or outside of your organization and control.  You should also take affirmative steps to prevent anyone with access to your data, systems or archives from seeking to modify destroy or hide ESI.

**As an appropriate and cost-effective means of preservation, you should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI.**  In the event that you deem it impractical to sequester those systems, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems identified above is expedient and cost effective.  As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods.   Failure to use such methods imposes a significant threat of spoliation and data loss.  Be advised that a conventional copy, backup or ghosting of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data.

**You should anticipate that certain ESI, including but not limited to recordings, spreadsheets and databases will be sought in the forms or form in which it was ordinarily maintained, that is in native form.**  Accordingly, you should preserve ESI in such native forms and should not employ methods to preserve ESI that remove or degrade the ability to search ESI by electronic means or that make it difficult or burdensome to use that information.

**You should further anticipate the need to disclose and produce system and application metadata and act to preserve it.**  System metadata is information describing the history and characteristics of other ESI.  This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access.  Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files.  As hard copies do not preserve electronic search ability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.  If information exists in both electronic and paper forms, you should preserve both the forms.

**We desire to work with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved.**  Alternatively, if you

promptly disclose the preservation protocol you intend to employ, perhaps we can now identify any points of disagreement and resolve them.

**A successful and compliant ESI preservation effort requires expertise.**  If you do not currently have such expertise, we urge you to engage the services of an expert in electronic evidence and computer forensics.  Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that is fair to both sides and acceptable to the Court.  I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay.  Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay of production of evidence to which we are entitled, that failure would constitute spoliation of evidence.

**Please confirm in writing no later than five (5) business days from the date of this Notice, that you have taken the steps outlined in this Notice to preserve ESI and tangible documents potentially relevant to this pending action.**  If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

If you retain legal counsel with respect to these matters, please direct this Notice to their immediate attention.  Thank you for your anticipated cooperation in this vital matter.